IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JAMES LAWRENCE PRINCE, JR.,           )
    Plaintiff,                              )
                                     )
           v.                                  )    Civil No. 3:16cv175 (HEH)
                                       )
NANCY A. BERRYHILL,[1]                  )
Acting Commissioner of Social Security, )
    Defendant.                              )
_____ )

## REPORT AND RECOMMENDATION

On January 8, 2013, James Lawrence Prince, Jr. ("Plaintiff") applied for Social Security

Disability Benefits ("DIB") under the Social Security Act ("Act"), alleging disability due to

permanent nerve damage, heart disease, diabetes, nerve damage in the shoulders, arms and hands

due to surgery, constant pain and weakness in the shoulders, arms and hands, and high blood

pressure, with an alleged onset date of September 30, 2012. The Social Security Administration

("SSA") denied Plaintiff's claim both initially and upon reconsideration. Thereafter, an

Administrative Law Judge ("ALJ") denied Plaintiff's claim in a written decision and the Appeals

Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision

of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the Appeals Council did not give substantial consideration to the new evidence

submitted by Plaintiff. (Mem. in Support of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 8)

---

[1]      On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill should be
substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this matter.

at 5.) Plaintiff further argues that the ALJ erred in failing to properly evaluate Plaintiff's credibility. (Pl.'s Mem. at 5.) Finally, Plaintiff argues that the ALJ erred by failing to issue a subpoena for otherwise unavailable medical evidence. (Pl.'s Mem. at 5.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter now ripe for review. For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

## I.    PROCEDURAL HISTORY

On January 9, 2013, Plaintiff filed an application for DIB with an alleged onset date of September 30, 2012. (R. at 72, 166.) The SSA denied these claims initially on April 16, 2013, and again upon reconsideration on November 20, 2013. (R. at 93, 102.) At Plaintiff's written request, the ALJ held a hearing on April 7, 2015. (R. at 32-69.) On May 7, 2015, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because he retained the residual functional capacity to perform his past relevant work. (R. at 24-25.) On January 28, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-4.)

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "tak[e] into account . . . 'whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citations omitted).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 416.920(a)(4)(iii).

Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite his physical and mental limitations. § 416.945(a). At step four, the ALJ assesses whether the claimant can perform his past work given his RFC. § 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 416.920(a)(4)(v).

## III.   THE ALJ'S DECISION

On April 7, 2015, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 32-69.) On May 7, 2015, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 12-25.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 15-25.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 30, 2012 through his date last insured of December 31, 2014. (R. at 17.) At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative joint disease (right shoulder and both knees), arthrosis (right shoulder), chronic liver disease, coronary artery disease, diabetes mellitus and obesity. (R. at 17.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526; (R. at 19).

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work as defined in 20 C.F.R § 404.1567(b) with certain limitations. (R. at 19-24.) Specifically, the ALJ found that Plaintiff could sit for six hours and stand and/or walk for six hours in an eight-hour workday. (R. at 19.) Plaintiff could frequently, but not constantly, handle, finger and feel with

his upper right extremity, which is his dominant hand. (R. at 19.) Plaintiff could occasionally reach overhead and could frequently perform all other reaching with his right upper extremity. (R. at 19.) Plaintiff could not tolerate exposure to hazards, such as unprotected heights and moving machinery. (R. at 19.) At step four, the ALJ found that Plaintiff could perform past relevant work as a director of customer service, as this did not require performance of work-related activities precluded by the RFC. (R. at 24.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 25.)

## IV.    ANALYSIS

Plaintiff, sixty-one years old at the time of this Report and Recommendation, previously operated a lawn service business and worked as a customer service director. (R. at 166, 193-94.) He applied for Social Security Benefits, alleging disability from degenerative joint disease of his right shoulder and both knees, arthrosis of his right shoulder, chronic liver disease, coronary artery disease, diabetes mellitus and obesity, with an alleged onset date of September 30, 2012. (Pl.'s Mem. at 4.) Plaintiff appeals to this Court, alleging that the ALJ erred by failing to properly evaluate Plaintiff's credibility. (Pl.'s Mem. at 2.) Plaintiff also alleges that the ALJ failed to develop the record and abused his discretion by refusing to issue a subpoena for evidence not otherwise available to the fact-finder. (Pl.'s Mem. at 2.) Plaintiff further alleges that the Appeals Council failed to properly evaluate new and material evidence relating back to the relevant period. (Pl.'s Mem. at 1.) For the reasons set forth below, the ALJ and the Appeals Council did not err in their decisions.

## A. Substantial Evidence Supports the ALJ's Decision to Diminish Plaintiff's Credibility.

Plaintiff contends that the ALJ failed to comply with the mandatory standards of 20

C.F.R. §§ 404.1529, 404.1530 and SSR 96-7p[2] in evaluating Plaintiff's credibility and the extent

of Plaintiff's impairments. According to Plaintiff, "the ALJ decision cherry-picked trivial

inconsistencies and took findings out of context" to find that Plaintiff experienced well-

controlled symptoms. (Pl.'s Mem. at 14.) Further, Plaintiff contends that he did not receive

"generally conservative" treatment, but rather, that it consisted of all available treatment options,

including a double-blind clinical study. (Pl.'s Mem. at 15.) Plaintiff argues that he "cannot be

faulted for failing to pursue non-conservative treatment options where none exist." (Pl.'s Mem.

at 16.) Defendant responds by arguing that substantial evidence supports the ALJ's credibility

determination and that the ALJ carefully considered and explained his rationale for diminishing

Plaintiff's credibility. (Def.'s Mem. at 20-28.)

This Court must give great deference to the ALJ's credibility determinations. *Eldeco,*

*Inc. v. N.L.R.B.,* 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that

"[w]hen factual findings rest upon credibility determinations, they should be accepted by the

reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. &*

*Chems. Inc.,* 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's

factual findings and credibility determinations unless "a credibility determination is

---

[2]      On March 16, 2016, the SSA issued SSR 16-3p, which rescinded and superseded SSR 96-7p, eliminating the credibility finding at issue here. The ALJ issued his opinion on May 7, 2015, before SSR 16-3p took effect on March 28, 2016. The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting the Agency retroactive rulemaking power). Because the SSR does not have retroactive effect, the Court will review the ALJ's decision under SSR 96-7p.

unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff suffers from a disability. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994) (citations omitted). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591. The ALJ's evaluation must take into account "all the available evidence," including a credibility determination of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Id* at 595-96; SSR 96-7p at 5-6.

It is appropriate for an ALJ to consider medication and treatment used to alleviate a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(v). If the claimant requires only conservative treatment, an ALJ is reasonable in holding that the alleged disability lacks the seriousness that the claimant alleges. *Dunn v. Colvin*, 607 F. App'x 264, 274-75 (4th Cir. 2015). Similarly, noncompliance with a treatment regimen can indicate a claimant's lack of credibility as to the severity of the alleged symptoms as well. *Id.* at 275-76. An ALJ may also properly "consider a claimant's daily activities in assessing the severity of a claimant's symptoms such as pain." *Ellis v. Colvin*, 2014 WL 2862703, at *11 (W.D. Va. June 24, 2014) (citations omitted).

In this case, the ALJ concluded that the evidence supported the nature of Plaintiff's impairments and limitations, but it did not support the degree of those limitations. (R. at 23.) Ultimately, the ALJ diminished Plaintiff's credibility, because Plaintiff's statements lacked

consistency with the objective medical evidence and the conservative nature of his medical treatment. (R. at 23.) Further, the ALJ concluded that Plaintiff's "statements to his doctors regarding his functioning undermine[d] . . . [Plaintiff's] allegations here." (R. at 23.) Substantial evidence supports the ALJ's credibility determination.

      i.      The Medical Evidence and Inconsistencies in Plaintiff's Statements Support the ALJ's Credibility Finding.

Plaintiff alleges that "[t]he ALJ decision failed to note that Plaintiff had consistently complained of unrelenting pain in his hands and shoulders, as well as weakness, numbness and cramping in the right hand throughout 2011." (Pl.'s Mem. at 14.) The ALJ did find that the evidence supported the nature of Plaintiff's symptoms. (R. at 23.) However, he diminished Plaintiff's credibility regarding "the *degree* of those limitations." (R. at 23 (emphasis in original).)

Indeed, Plaintiff complained of pain in his hands and shoulders and weakness, cramping, and numbness in his right hand. *See, e.g.*, (R. at 206-13, 282, 294, 316.) However, the medical record supports a finding that, though Plaintiff had these symptoms throughout 2011, he reported that his symptoms improved over the course of the year. *See* (R. at 294, 302, 310, 443.) Further, in those instances where Plaintiff did not explicitly report an improvement in symptoms, the medical evidence does not indicate that the symptoms reached an "unrelenting" level.

For example, on January 11, 2011, Plaintiff complained to Mark J. Rosenberg, M.D., of "pain and weakness" in his right ulnar nerve following a heart catheterization, and Dr. Rosenberg recorded that Plaintiff had decreased grip strength. (R. at 294.) During a subsequent visit on January 18, 2011, Plaintiff still complained of right arm ulnar neuropathy, but he reported that his symptoms had improved by 40% and that the remaining pain and numbness felt less severe. (R. at 302.) Plaintiff continued to report pain, though he indicated improvement. (R. at 310.) In

October 2011, Dr. Rosenberg documented that Plaintiff continued to complain of pain in his distal right upper extremity and referred Plaintiff to a neurosurgeon, but he did not document whether the pain had increased. (R. at 334.)

On January 20, 2012, Plaintiff reported to Neha Mody, PA-C, that he had excruciating pain as well as numbness in his right forearm after open heart surgery "about 2 years ago." (R. at 436.) Then, in February 2012, Plaintiff reported to Matthew T. Mayr, M.D., that, while the pain from his open heart surgery a year and half before had improved, he had experienced "ungodly" hand cramping in late summer. (R. at 443-44.)

Indeed, Plaintiff sought medical treatment in late summer 2011, but the records from those appointments do not indicate complaints of pain reaching the level that Plaintiff described in January 2012. For example, on September 6, 2011, he reported numbness, cramping and spasms in his right hand to Douglas Wayne, M.D. (R. at 431.) However, when Plaintiff saw Dr. Rosenberg on September 12, 2011, though he complained of "intermittent cramping of his hands," he reported that his "[p]revious right ulnar neuropathy symptoms are somewhat better." (R. at 316.) Nowhere in the medical record for that visit did he report to Dr. Rosenberg that he had experienced ungodly or excruciating hand cramping. (R. at 316.) Dr. Mayr performed tests on Plaintiff on February 22, 2012, which returned negative results for ulnar neuropathy and C8 radiculopathy, but showed carpal tunnel syndrome. (R. at 447.) On October 3, 2012, Stewart Jennings, M.D., noted plans for rotator cuff surgery and a procedure on Plaintiff's right ulnar nerve, as well as noted joint pain, stiffness, numbness and tingling, but Dr. Jennings did not indicate any severity of pain. (R. at 425, 427.)

The medical records also document that Plaintiff had occasional and reoccurring pain in his shoulders, but that "it was nothing like what he had previously." (R. at 728-31.)

Specifically, on October 29, 2014, Plaintiff "state[d] he has good and bad days with his shoulder ... [but h]e does not feel that he has excruciating pain." (R. at 731.) After receiving injections for his shoulder in January 2015, a few months before the ALJ issued his decision, Plaintiff reported "some pain that is beginning to return, but it is minimal and manageable." (R. at 731.)

In addition to the medical evidence in the record, the ALJ considered Plaintiff's own reported activities (*e.g.*, carrying firewood; pulling a saw; caring for his grandchild) and found those activities inconsistent with Plaintiff's "allegations that he cannot stand or walk for more than a few minutes." (R. at 23.) This, coupled with the substantial evidence present in the record at the time of the ALJ's decision, supports the ALJ's credibility finding.

      ii.     The Conservative Nature of Plaintiff's Treatment Supports the ALJ's Credibility Finding.

Plaintiff's conservative treatment history further supports the ALJ's credibility determination. This Court has recognized that "[t]here exists no bright-line rule between what constitutes 'conservative' versus 'radical' treatment." *Gill v. Astrue*, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012). However, an ALJ may properly classify taking prescription medication as "conservative treatment." *Johnson v. Colvin*, 2016 WL 1090667, at *13 (W.D. Va. Mar. 18, 2016) (citations omitted). An ALJ may appropriately consider medication and treatment used to alleviate a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(v). If the claimant requires only conservative treatment, an ALJ may reasonably hold that the alleged disability lacks the seriousness that the claimant alleges. *Dunn*, 607 F. App'x at 274-75. Similarly, noncompliance with a treatment regimen can indicate a claimant's lack of credibility as to the severity of the alleged symptoms as well. *Id.* at 275-76.

Plaintiff contends that his enrollment in a double-blind clinical study for liver medication and his severe fatigue as a result undermines the ALJ's finding that Plaintiff received

conservative treatment, because Plaintiff received "the full panoply of treatment options available," and that "[t]his determination to pursue diligently all treatment options before resorting to a potentially fatal liver transplant bolsters Plaintiff's credibility." (Pl.'s Mem. at 15-16.) The ALJ, however, considered the treatment for all asserted issues, not just the liver disease, when deciding the conservative nature of Plaintiff's treatment. The ALJ stated that Plaintiff's treatment was conservative in part because, "[w]hen he did have surgery, it was generally successful quickly, such as after his tendon repair in early 2013 when he was doing so well that a month later he did not have to undergo physical therapy." (R. at 23.) The record supports this finding.

After Plaintiff's rotator cuff surgery in early 2013, Dr. Spiegler did not recommend formal physical therapy, instead instructing Plaintiff to perform certain exercises at home. (R. at 467.) He did have some pain afterwards, but it decreased when Plaintiff discontinued the "heavy activities" that he reported doing, such as wood splitting. (R. at 471.) His pain continued to improve through the use of injections in his shoulder. (R. at 478.) Though Dr. Spiegler considered surgery on Plaintiff's shoulder in 2015, Plaintiff reported that the cortisone injections had provided some relief. (R. at 686.) Mitchell L. Shiffman, M.D., also prescribed Plaintiff steroids during 2015 to improve his knee pain. (R. at 686.)

Plaintiff further contends that the new evidence submitted to the Appeals Council demonstrates that Dr. Shiffman's choice to enroll Plaintiff in the study was a proper medical decision to possibly avoid surgery, not a conservative treatment. (Pl.'s Mem. at 16.) Even absent the letter from Dr. Shiffman regarding the rationale for Plaintiff's participation in the

study,[3] Plaintiff told the ALJ that he entered the study and received medication to help improve

his liver condition before he required a liver transplant. (R. at 36-37.) Therefore, the ALJ had

the opportunity to consider the purpose and method of treatment during the double-blind clinical

study when making his decision. In light of the treatments used for all alleged conditions,

mainly treatment through medication and a limited need for physical therapy, the objective

medical evidence supports the ALJ's credibility finding based in part on the conservative nature

of Plaintiff's treatment.

## B. The Appeals Council Did Not Err by Refusing to Grant Plaintiff's Request for Review Due to the Evidence Not Already in the Record.

Plaintiff argues that the Appeals Council erred by failing to consider the new evidence

that he submitted with his request for review of the ALJ's decision. (Pl.'s Mem. at 5.)

Specifically, Plaintiff submitted liver biopsy results, a letter from Dr. Shiffman and Nurse Long,

a list of dates on which Dr. Shiffman treated Plaintiff, and an updated physician's questionnaire

(the "Updated Questionnaire") submitted by Dr. Spiegler. (Pl.'s Mem. at 8; R. at 748-63.)[4] He

claims that this evidence, which relates to the relevant time period, qualifies as new because it

does not duplicate other evidence in the record and as material because its contents would

reasonably change the weight that the ALJ gave to Plaintiff's subjective complaints and the

opinions of his doctors. (Pl.'s Mem. at 11-12.)

---

[3]    As a separate issue, Plaintiff argues that the Appeals Council improperly denied Plaintiff's request for review to consider a statement from Dr. Shiffman and April G. Long, NP, submitted after the ALJ's decision. (Pl.'s Mem. at 8-12.) Although the Court finds that the Appeals Council did not err in denying Plaintiff's request for review in light of the new statement, the statement would support the ALJ's finding, because Dr. Shiffman and Nurse Long stated that the study treated Plaintiff with medication only. (R. at 754.)

[4]    Plaintiff submitted additional evidence to the Appeals Council (R. at 260-79; 740-47); however, he focuses only on these four items in his argument that the Appeals Council failed to consider the new evidence that he submitted.

Defendant responds that the evidence submitted by Plaintiff does not qualify as either new or material. (Def.'s Mem. at 20.) Defendant argues that Plaintiff did not submit new evidence, because Plaintiff had access to it at the time of the administrative proceeding. (Def.'s Mem. at 21-22.) Defendant further argues that the evidence lacks materiality because: (1) the liver biopsies and letter from Dr. Shiffman and Nurse Long support evidence already in the record; (2) the new limitations submitted by Dr. Spiegler lack any explanation or support; and, (3) the evidence would not reasonably change the ALJ's decision. (Def.'s Mem. at 22-23.)

In determining whether substantial evidence supports the ALJ's decision, a district court cannot consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714-15 (1963)); *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) (citing *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1970)) (noting that reviewing courts are restricted to the administrative record in determining whether substantial evidence supports the decision).

However, when a claimant submits evidence not already in the record to the Appeals Council, the Appeals Council must consider that evidence if it is new, material, and relates "to the period on before the date of the ALJ decision." 20 C.F.R. § 404.970(b) (2016)[5]; *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). "Evidence is new if it is not duplicative or cumulative and is material if there is a reasonable possibility that the new evidence would have

---

5       Effective January 17, 2017, the Agency amended 20 C.F.R. § 404.970(b) to also require, *inter alia*, that a claimant show good cause for not submitting the additional evidence to the ALJ pursuant to 20 C.F.R. § 404.395. The ALJ issued his opinion on May 7, 2015, and the Appeals Council denied Plaintiff's request for review on January 28, 2016. As previously stated, the Agency does not have the power to engage in retroactive rulemaking. Consequently, the Court will review the Appeals Council's decision under the version of the regulation in effect at the time that it rendered its decision.

changed the outcome." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (internal quotations

marks omitted). If the new evidence submitted to the Appeals Council meets both requirements,

the court "must review the record as a whole, including the new evidence, in order to determine

whether substantial evidence supports the Secretary's findings." *Wilkins*, 953 F.2d at 96.

The Court finds that all of the evidence presented by Plaintiff relates to the relevant

period. Collectively, the records relate to Plaintiff's treatment between April 2012 and March

2015, before the ALJ issued his decision in May 2015. (R. at 748-63); 20 C.F.R. § 404.970.

However, Plaintiff failed to show that these records constitute new and material evidence

sufficient to warrant remand.

     i.     The Appeals Council Did Not Err By Denying Plaintiff's Request for Review
            Based on Dr. Spiegler's Updated Questionnaire.

The Court finds that, though Dr. Spiegler's Updated Questionnaire qualifies as new

evidence, Plaintiff failed to establish its materiality. As a result, the Appeals Council did not err

by denying Plaintiff's request for review based on the Updated Questionnaire.

Plaintiff alleges that Dr. Spiegler's Updated Questionnaire qualifies as "new" because

"the [ALJ] did not have the benefit of reviewing . . . Dr. Spiegler's opinion regarding restrictions

on the Plaintiff's ability to use his right dominant hand." (Pl.'s Mem. at 11.) Plaintiff further

contends that the evidence qualifies as material because "Dr. Spiegler's assessment clarifies that

Plaintiff is not able to effectively use his hands at all in a work setting." (Pl.'s Mem. at 12.)

Defendant responds that the Updated Questionnaire does not qualify as "new" because Plaintiff

could have obtained the information before the ALJ's decision, and that it does not qualify as

"material" because it duplicated information already in the record. (Def.'s Mem. at 21-22.)

Plaintiff submitted Dr. Spiegler's physician's questionnaire, dated March 3, 2015 (the

"Original Questionnaire"), before the hearing (R. at 736-39), which the ALJ considered before

issuing his decision. (R. at 22-24.) After the ALJ's decision, Plaintiff submitted the Updated Questionnaire from Dr. Spiegler that contains identical information as the Original Questionnaire with three additions. (R. at 755-58.) First, Dr. Spiegler added right "cubital [and] carpal tunnel syndrome" to Plaintiff's diagnoses that previously only addressed Plaintiff's knees and shoulders. (R. at 736, 755.) Next, Dr. Spiegler included right "hand [and] elbow spasms and numbness" to Plaintiff's symptoms that before had related only to Plaintiff's knee and right shoulder pain. (R. at 736, 755.) Finally, the Updated Questionnaire adds Dr. Spiegler's assessment of Plaintiff's "*significant limitations* in reaching, handling or fingering" in his hands, finger, and arms under question 10, which Dr. Spiegler originally left blank. (R. at 738, 757 (emphasis in original).) Dr. Spiegler reported that: Plaintiff could use both of his hands 50% of the time for grasping, turning, or twisting objects; he could never use any of his fingers for fine manipulation; and he could use his left and right arms 80% of the time for reaching. (R. at 757.) The Updated Questionnaire otherwise reflects the exact same information, including treatment dates, as the Original. (R. at 736-39, 755-58.)

The information submitted by Plaintiff qualifies as "new" to the extent of Dr. Spiegler's response to question 10 of the Updated Questionnaire only. Although the record includes information regarding Plaintiff's carpal tunnel syndrome, pain, cramping and numbness, it does not include information about specific percentages regarding each of these limitations. Thus, this evidence provides information not merely duplicative or cumulative of evidence already in the record.

However, Plaintiff has failed to show the materiality of the Updated Questionnaire — that it could reasonably change the outcome of the ALJ's decision. The ALJ gave Dr. Spiegler's Original Questionnaire "little weight," in part, because the record did not support the postural

limitations that he articulated. (R. at 24, 738.) Specifically, Dr. Spiegler opined that Plaintiff could never climb ropes or scaffolds, kneel, crouch or crawl, he could rarely balance, stoop or climb ladders, and he could only occasionally climb ramps or stairs. (R. at 738.) The ALJ found those determinations inconsistent with Plaintiff's own statements about his functioning and the "consistently mild" symptoms that he reported to his doctors. (R. at 24.) The ALJ also declined to assign more weight to Dr. Spiegler's questionnaire, because it contained no upper body limitations due to Plaintiff's shoulder pain and carpal tunnel syndrome — impairments that the ALJ found supported by the record. (R. at 23-24.)

After the ALJ's decision, Dr. Spiegler simply updated the portion of the questionnaire that the ALJ found lacking. That Dr. Spiegler limited Plaintiff's ability to reach, handle or feel, would not reasonably change the outcome. Instead, this evidence supports the ALJ's decision. The ALJ acknowledged Plaintiff's "recurring" shoulder pain and his carpal tunnel syndrome as "the most severe of and persistent of his symptoms." (R. at 23.) In fashioning the RFC, the ALJ limited Plaintiff to frequent — not constant — handling, fingering and feeling with his right, dominant hand. (R. at 19.) The ALJ also found that Plaintiff could only occasionally reach overhead, but otherwise reach frequently, with his right hand. (R. at 19.) The Updated Questionnaire would not reasonably change the RFC, let alone the outcome of this case.

Dr. Spiegler offers no explanation or additional objective medical evidence in support of the new upper extremity limitations included in the Updated Questionnaire. The treatment dates remained the same as they had in the record before the ALJ, meaning that Dr. Spiegler's new assessment relied on his previous treatment records of Plaintiff, which the ALJ had the full benefit of reviewing. (R. at 400-05, 408-24, 449-52, 460-65, 467-72, 474-80, 728-32, 736-39.) On October 19, 2012, Dr. Spiegler operated on Plaintiff's right shoulder. (R. at 401-02.) Less

than one month later, Plaintiff had full range of motion and reported relief in his shoulder, but he complained about cramping in his right hand. (R. at 412-13.) He also stated that he had recently used a pull saw for three hours, which caused only minor aching. (R. at 413.)

On January 11, 2013, Dr. Spiegler performed a right carpal and cubital tunnel release. (R. at 404-05.) In February and March 2013, Plaintiff's pain decreased, though he continued to have discomfort in his right shoulder, and Dr. Spiegler recommended home exercises as opposed to formal physical therapy. (R. at 467, 470-71.) On April 23 and May 21, 2013, Plaintiff had full range of motion, and Dr. Spiegler again noted improvement in Plaintiff's discomfort level. (R. at 477-78.) By July 2013, Plaintiff stated that he had only "occasional discomfort" in his shoulders when he engaged in certain activity. (R. at 479.)

In January 2014, Plaintiff saw Dr. Spiegler for an injection when his right shoulder pain returned. (R. at 729.) On September 11, 2014, Plaintiff reported caring for his young grandchild and "do[ing] well" ever since the injection, aside from recent severe shoulder pain. (R. at 729.) Over the next two months, Plaintiff had "good and bad days" with his right shoulder, and he cancelled his December 2014 appointment because he felt "good." (R. at 730-31.) Dr. Spiegler did not note any concerns about Plaintiff's hands or left shoulder throughout 2014. (R. at 736-39, 755-58.) By January 2015, Dr. Spiegler noted that the injections had reduced Plaintiff's shoulder pain such that it remained "minimal and manageable." (R. at 731.) At Plaintiff's last appointment with Dr. Spiegler, on March 3, 2015, Dr. Spiegler prepared the Original Questionnaire. (R. at 736-39.)

The Court cannot find that the ALJ would have reasonably reached a different outcome if he had the benefit of considering the six new limitation percentages (three for each of Plaintiff's hands) in the Updated Questionnaire. First, these limitations do nothing to dissuade the other

reasons that the ALJ articulated for assigning little weight to Dr. Spiegler's Original Questionnaire. The postural limitations that Dr. Spiegler originally noted (*e.g.*, that Plaintiff could never kneel or crouch, and he could rarely balance or stoop) conflict with Plaintiff's admitted activities, including using a pull saw for three hours and caring for his three-year-old grandchild. (R. at 413, 729, 738.)

Second, Plaintiff includes no new objective medical evidence from Dr. Spiegler to support these new limitations. Indeed, the Updated Questionnaire shows March 3, 2015 as the last date that Dr. Spiegler examined Plaintiff — the same date reflected in the Original. (R. at 739, 758.) Thus, Dr. Spiegler relied on his prior examinations of Plaintiff when he updated the questionnaire. Those prior treatment records which, as described above, largely focus on Plaintiff's shoulders and his rights hand, similarly do not comport with Dr. Spiegler's updated opinion that Plaintiff remains equally limited in both of his hands.

Third, as explained above, the ALJ already incorporated limitations to Plaintiff's right upper extremity into the RFC, based on the evidence in the record. (R. at 19-23.) Consequently, the Updated Questionnaire does not qualify as material evidence to justify remand. To hold otherwise, the Court would have to find that, based on these new limitations, the ALJ would reasonably have: (1) given more weight to Dr. Spiegler's opinion despite discounting it for other reasons; (2) increased the upper extremity limitations in Plaintiff's RFC, despite Plaintiff's admitted activities exceeding those limitations, such that the ALJ would find that (3) Plaintiff could not perform his past work as a customer service director. The Updated Questionnaire does not provide sufficient support for such inferential leaps.

ii.     The Appeals Council Did Not Err in Denying Plaintiff's Request for Review
Based on Additional Evidence Submitted Regarding the Liver Biopsy Results, Dr.
Shiffman's Statement and List of Treatment Dates.

Plaintiff also submitted liver biopsy results, a statement by Dr. Shiffman and Nurse Long

regarding Plaintiff's symptoms and a list of treatment dates. (R. at 748-54, 759-63.) Plaintiff

argues that these additional medical records "show a new, more complete picture of Mr. Prince's

medical condition" and do not duplicate evidence already in the record. (Pl.'s Mem. at 11.)

Plaintiff also argues that the records qualify as material, because the additional records support

the severity of Plaintiff's conditions. (Pl.'s Mem. at 11-12.). Defendant responds that Plaintiff

could obtain these records before the ALJ's decision and, therefore, they do not constitute new

evidence. (Def.'s Mem. at 20-22.) Defendant also argues that Plaintiff failed to establish how

these records would reasonably change the ALJ's decision. (Def.'s Mem. at 22.)

a.  Liver Biopsy Results

The Court finds Plaintiff's arguments unpersuasive. First, the liver biopsy records do not

contain any new evidence. These records as a whole demonstrate potentially severe medical

problems with Plaintiff's liver. (R. at 748-53.) However, the record reviewed by the ALJ

already contained that information. (R. at 615-50, 733-35.) For instance, in his physician's

questionnaire dated March 9, 2015, Dr. Shiffman documented Plaintiff's pain and symptoms

related with advanced liver disease and the potential need for a liver biopsy. (R. at 733-35.) The

record also contained Plaintiff's medical records and Dr. Shiffman's notes both before and after

the biopsy. (R. at 615-50.) During the hearing, Plaintiff testified that his liver problems would

require him to get a liver transplant within five years if his symptoms did not improve. (R. at

36.) Therefore, the liver biopsy results support information already in the record, but they do not

constitute "new" evidence.

Second, the liver biopsy records do not qualify as "material." The ALJ considered Plaintiff's visits to Dr. Shiffman and the results of the liver biopsy when making his decision. (R. at 21-22, 615-50.) He also reviewed Dr. Shiffman's questionnaire, which referenced advanced liver disease and other liver problems, when making his final determination. (R. at 24, 733-735.) Therefore, the ALJ considered the severity of Plaintiff's liver disease before making his decision, and Plaintiff has failed to demonstrate how, in light of these other records and considerations, the liver biopsy documentation would reasonably change the outcome of that decision.

b. List of Treatment Dates

The list of treatment dates from Dr. Shiffman similarly does not constitute new or material evidence. While the record otherwise did not contain every specific date on which Dr. Shiffman saw Plaintiff, Dr. Shiffman did provide the first and last examination dates on his questionnaire, and those dates encompass the relevant treatment dates that Plaintiff submitted as new evidence to the Appeals Council. (R. at 24, 735, 759-63.) Thus, the list of dates is merely cumulative of evidence already found in the record.

Additionally, Plaintiff has not proven the materiality of this information. The document lists dates on which Dr. Shiffman saw Plaintiff and general categories of procedures done, including liver biopsies, clinical research screenings and a liver procedure. (R. at 759-63.) However, Dr. Shiffman's questionnaire noted Plaintiff's problem with liver disease and prior liver biopsies. (R. 733-34.) The new evidence submitted does not contain any specific information regarding the details or outcomes of the treatments actually performed or the symptoms reported by Plaintiff during this period. (R. at 759-63.) In fact, Dr. Shiffman's questionnaire contains more detail of the symptoms than the list of treatment dates and links

Plaintiff's conditions to his physical symptoms. (R. at 733-35.) Therefore, Plaintiff has not established how the list of treatment dates submitted to the Appeals Council would reasonably have changed the outcome of Plaintiff's disability determination.

    c. Dr. Shiffman's and Nurse Long's Statement

Plaintiff also has not proven how Dr. Shiffman's and Nurse Long's statement submitted to the Appeals Council constitutes either new or material evidence. The statement provides three types of information. First, it explains that Plaintiff participated in the clinical trial because "[t]here is currently no treatment available to treat this chronic liver disease." (R. at 754.) Second, it details the treatment given to Plaintiff, including the types of exams and tests performed. (R. at 754.) Finally, it indicates that Plaintiff "has consistently had severe fatigue throughout this clinical trial which has interfered with his daily activities." (R. at 754.)

Plaintiff contends that this statement constitutes new evidence because "[t]he [ALJ] did not have the benefit of reviewing . . . Dr. Shiffman's opinion regarding Plaintiff's longitudinal fatigue or record of treatment dates." (Pl.'s Mem. at 11.) The Court disagrees. The record reviewed by the ALJ contained information about Dr. Shiffman's suggestion that Plaintiff participate in the double-blind clinical trial and Plaintiff's interest in doing so. (R. at 646.) Additionally, Plaintiff testified at the hearing that he entered the clinical study while under Dr. Shiffman's care, because no known cure existed and he could require a liver transplant if his condition did not improve. (R. at 36.) In the questionnaire available to and considered by the ALJ, Dr. Shiffman and Nurse Long repeatedly noted that Plaintiff experienced "severe fatigue" during his treatment. (R. at 733-34.) The statement submitted to the Appeals Council merely duplicates this evidence already in the record.

Plaintiff also contends that this statement constitutes material evidence, because the ALJ could not review these additional treatment records when he determined that Plaintiff lacked support for the severity of his disease. (Pl.'s Mem. at 12.) However, as explained above, this statement does contain any information not duplicative of information already in the record. On its own, the statement describes symptoms and treatment discussed at the hearing and described in Dr. Shiffman's questionnaire. Taken with the list of treatment dates, this letter reinforces that Plaintiff saw Dr. Shiffman during the time period listed on the questionnaire, received the treatment outlined in the questionnaire and suffered from the fatigue described in the questionnaire. As a result, Plaintiff has not proven how this new statement, even in combination with the treatment dates, might reasonably have changed the ALJ's decision.

Because the additional evidence that Plaintiff submitted to the Appeals Council for consideration duplicates evidence already in the record and/or would not reasonably change the outcome, Plaintiff's argument that this evidence justifies remand fails.

## C. The ALJ Did Not Err By Not Issuing a Subpoena to Obtain the Double-Blind Clinical Study Records.

Plaintiff contends that the ALJ failed to develop the record by not subpoenaing Plaintiff's clinical trial records. (Pl.'s Mem. at 16.) Specifically, Plaintiff argues that the records from the double blind study "would likely have materially affected the ALJ's finding as to the severity of Plaintiff's fatigue and related functional limitations." (Pl.'s Mem. at 18.) Defendant responds that Plaintiff failed to specifically request that the ALJ issue a subpoena, or, in the alternative, the ALJ made a harmless error, because Plaintiff failed to establish what records the clinical study had and how they related to Plaintiff's functional limitations. (Def.'s Mem. at 28-30.)

Plaintiff bears the burden of proving his disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981) (citations omitted). The ALJ, however, "has a duty to explore all relevant facts

and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citations omitted). The ALJ may develop the record by questioning the claimant or other witnesses, examining documents or other material evidence, or subpoenaing witnesses or other testimony when "reasonably necessary for the full presentation of the case." 20 C.F.R. §§ 404.944, 404.950(d), 416.1444, 416.1450(d). The ALJ retains the responsibility to develop the record in all proceedings. *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000). When a claimant appears *pro se* before the ALJ, "the ALJ ha[s] a heightened duty of care to adequately develop the record." *Craig*, 76 F.3d at 591; *see also Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980) ("[ALJs] have a duty to assume a more active role in helping claimants develop the record."). When the claimant appears at the hearing with counsel, however, the ALJ may assume that the claimant "is making his strongest case for benefits." *Stuckey v. Colvin*, 2016 WL 403651, at *11 (E.D. Va. Jan. 11, 2016) (quoting *Nicholson v. Astrue*, 341 F. App'x 248, 253 (7th Cir. 2009) (citation omitted)).

Courts review an ALJ's decision whether to issue a subpoena under an abuse of discretion standard. *Taylor v. Weinberger*, 528 F. 2d 1153, 1156 (4th Cir. 1975). The ALJ has the discretion to issue a subpoena "[w]hen it is reasonably necessary for the full presentation of a case." 20 C.F.R. § 404.950(d)(1). The requesting party must file a written request to the ALJ or an Agency office at least five days before the hearing date. § 404.950(d)(2). The request "must [include] the names of the . . . documents to be produced; describe the address or location of the . . . documents with sufficient detail to find them; state the important facts that the . . . document is expected to prove;" and explain why the requesting party cannot otherwise prove these facts without the subpoena. 20 C.F.R. § 404.950(d)(2). Even upon request to issue a subpoena, the

ALJ maintains discretion to decide whether to comply with that request. *See Lidy v. Sullivan*, 911 F.2d 1075, 1077 (5th Cir. 1990) (explaining that the ALJ may refuse a request for a subpoena when the evidence "is not 'reasonably necessary for the full presentation of the case'"); *Wallace v. Bowen*, 869 F.2d 187, 193 (3d Cir. 1989) (explaining that the claimant has no right to a subpoena after the hearing date); *Ford v. Comm'r of Soc. Sec.*, 143 F. Supp. 3d 714, 720 (S.D. Ohio 2015) ("[C]laimants have no absolute right to subpoena witnesses for testimony at the administrative hearing . . . .") (citing *Flatford v. Chater*, 93 F.3d 1296, 1300 (6th Cir. 1996)).

The Fourth Circuit will remand a case "[w]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record." *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). For example, a court might remand when the ALJ did not obtain any tests or opinions needed to determine whether a plaintiff met the impairment requirements, *Cook*, 783 F.2d at 1173-74, or if the record did not contain medical source statements from a treating physician, *Vanhart v. Colvin*, 2013 WL 12121325, at *13 (E.D. Va. June 19, 2013), *report and recommendation adopted*, 2013 WL 12123245 (E.D. Va. Aug. 12, 2013). However, where the ALJ's failure to obtain additional medical records did not prejudice the claimant, a court will not find that the ALJ erred. *Zook v. Comm'r of Soc. Sec.*, 2010 WL 1039456, at *5 (E.D. Va. Feb. 25, 2010), *report and recommendation adopted sub nom. Zook v. Astrue*, 2010 WL 1039830 (E.D. Va. Mar. 18, 2010). Further, when the ALJ fails to issue a subpoena after promising to do so, a court considers the party's reliance on that promise and whether the subpoenaed information would have affected the ALJ's decision. *See Marsh v. Harris*, 632 F.2d 296, 299-300 (4th Cir. 1980) ("The ALJ . . . breached his promise to Marsh to obtain further evidence from . . . the treating physician. . . . Not only did Marsh rely on the ALJ to obtain this testimony, but if obtained it might well have contributed to a proper ALJ decision.").

Counsel represented Plaintiff at the hearing before the ALJ on April 7, 2015. (R. at 32.)
During the hearing, the ALJ, counsel and Plaintiff discussed whether the ALJ would issue the
subpoena.[6] (R. at 35.) In response to the ALJ's question about whether he needed any other
information to complete the record, Plaintiff's then-counsel responded that Dr. Shiffman would
not provide Plaintiff's medical records due to the double-blind nature of the study. (R. at 35.)
Plaintiff explained that Dr. Shiffman put him on medicine in 2013 as part of the study to stop his
liver deterioration. (R. at 36-37.) Plaintiff visited Dr. Shiffman once a month to receive the
medicine, undergo bloodwork and perform "a little physical." (R. at 37, 66.) He further testified
that the study told the doctor very little. (R. at 66.) The ALJ acknowledged that the records
"could be relevant . . . but it may be a situation where it's . . . duplicative of information"
already in the record. (R. at 39.) He initially said that he would issue the subpoena, but then
explained that he would withhold doing so until Plaintiff's counsel determined whether Dr.
Shiffman had more records or was "acting as a conduit to somewhere else." (R. at 65-67.)

In an April 8, 2015 letter to the ALJ, Plaintiff's counsel confirmed that Dr. Shiffman's
office had no medical records for Plaintiff after November 7, 2013. (R. at 259.) The letter then
provided the contact information for the pharmaceutical company providing the medication
"should [the ALJ] wish to subpoena [Plaintiff's] study records." (R. at 259.)

Plaintiff has not shown that the ALJ's failure to issue the subpoena prejudiced him.
Plaintiff argues that the ALJ abused his discretion, because "the evidence Plaintiff sought by
subpoena from the double blind clinical trial would likely have materially affected the ALJ's
finding as to the severity of Plaintiff's fatigue and related functional limitations." (Pl.'s Mem. at
18.) Plaintiff does not specify whether the ALJ failed to issue a subpoena for the records of Dr.

---

[6]     The record does not contain any request from Plaintiff to the ALJ to issue a subpoena for
these records at least five days before the hearing date, as required by 40 C.F.R. § 404.950(d)(2).

Shiffman, Gilead Pharmaceuticals or both. Thus, the Court will analyze each potential subpoena request.

First, the ALJ did not err in failing to subpoena records from Dr. Shiffman, the liver specialist treating Plaintiff during the clinical trial. The record lacks evidence that Plaintiff formally requested the subpoena under the procedure set forth in 20 C.F.R. § 404.950(d)(2), though the ALJ considered the issue at the hearing. (R. at 36-39, 63-68.) Plaintiff has not shown how the failure to obtain those records prejudiced him. Even absent the medical records, Dr. Shiffman and Nurse Long completed a questionnaire detailing Plaintiff's symptoms, diagnoses and prognosis while under Dr. Shiffman's care. (R. at 733-35.) The questionnaire considered Plaintiff's condition from October 1, 2013 through March 9, 2015. (R. at 735.) Throughout the questionnaire, Dr. Shiffman and Nurse Long described the pain and severe fatigue that Plaintiff experienced due to his liver disease and the limitations that his symptoms have on his "ability to work at a regular job on a sustained basis." (R. at 733-34.) Dr. Shiffman and Nurse Long opined that his symptoms would frequently interfere with his ability to concentrate on even simple work tasks. (R. at 733-34.) Therefore, Dr. Shiffman and Nurse Long's responses not only detailed the symptoms and their severity, but their opinions allowed the ALJ to consider the impact those symptoms had on Plaintiff's ability to work.

Further, not only did the ALJ acknowledge Dr. Shiffman's report during the hearing, but he also considered it when making his final disability determination.[7] (R. at 22, 68-69.) While the clinical study records might further support Dr. Shiffman and Nurse Long's questionnaire

---

[7]     The ALJ ultimately gave Dr. Shiffman's opinion little weight, because he determined that Plaintiff's alleged fatigue and need for frequent bathroom breaks did not comport with the objective medical evidence and statements made by Plaintiff to his primary care physician. (R. at 24.) He also explained that Dr. Shiffman's "conclusion that the claimant would miss three or more days of work per month is not supported by the record," because the record indicated that Plaintiff had "relatively mild limitations and significant overall functioning." (R. at 24.)

responses. Plaintiff fails to show that those records would have materially altered the ALJ's decision.

Second, the ALJ did not err in failing to subpoena Plaintiff's study records from Gilead Pharmaceuticals. The April 8, 2015 letter from Plaintiff's then-counsel providing the ALJ with the contact information for Gilead Pharmaceuticals does not follow the procedure for subpoena requests outlined in 20 C.F.R. § 404.950(d)(2) (requiring the requesting party to: (1) file a written request at least five days before the hearing; (2) give the names of the documents the party wants produced; (3) describe the address or location with enough detail to find them; (4) state the important facts that the party expects the documents to prove; and (5) explain why the party cannot obtain the evidence without a subpoena). Plaintiff's counsel explained the difficulty that she had in trying to obtain Dr. Shiffman's medical records at the outset of the hearing, indicating that she knew of the records and the possible need for a subpoena before the hearing. (R. at 35.) Plaintiff did not send a formal letter regarding these issues until April 8, 2015 — the day after the hearing. (R. at 259.) The letter did not directly request that the ALJ issue a subpoena for Gilead Pharmaceutical's records, but instead provided contact information "should [he] wish to subpoena" them. (R. at 259.) The letter also did not include the important facts that Plaintiff expected the records to prove, nor did it explain why Plaintiff could not prove those facts without the subpoena.

Additionally, as to the double-blind clinical study records generally, Plaintiff's then-counsel explained the difficulty that she had in obtaining the records but not what facts that she expected the records to elicit that the record did not already reflect. (R. at 35-38.) Plaintiff does not sufficiently demonstrate that he suffered prejudice without the subpoena. Thus, the ALJ did

not abuse his discretion by choosing not to issue the subpoena, and for the foregoing reasons, the ALJ did not thereby fail to develop the record.

## V.     CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                                            /s/
                                        David J.  Novak
                                        United States Magistrate Judge

Richmond, Virginia
Date:  June 19, 2017